UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

D.C.,

                          Petitioner,

          -v-

KRISTI NOEM, *in her official capacity as Secretary U.S.
Department of Homeland Security, et al.*,

                          Respondents.

---

26 Civ. 1833 (PAE)

<u>OPINION & ORDER</u>

---

PAUL A. ENGELMAYER, District Judge:

Detained noncitizen D.C.[1] petitions here for a writ of habeas corpus ordering that U.S.

immigration authorities hold a bond hearing to determine whether his prolonged detention is

necessary while he awaits removal. Dkt. 1 ("Pet."). D.C., age 62, is a citizen of the Dominican

Republic who has lived in the United States for most of his adult life. Since September 9, 2025,

he has been detained by United States Immigration and Customs Enforcement ("ICE") under 8

U.S.C. § 1226(c), which provides for mandatory detention of noncitizens with certain prior

convictions. In his petition, D.C. claims that his continued detention—which as of today has

lasted nearly six and a half months—without a bond hearing violates due process. He also

claims that his severe medical and mental health conditions warrant his immediate release

pending adjudication of his petition.

For the reasons that follow, the Court grants the petition insofar as it seeks an

individualized bond hearing, with constitutionally adequate procedural safeguards, to occur

---

[1] On March 5, 2026, D.C. moved for leave, pursuant to Federal Rule of Civil Procedure 5.2(e), to proceed under his initials. Dkt. 3. Respondents do not oppose that request. The Court grants it for the reasons stated in D.C.'s motion. Dkt 3-1 at 2–5 (applying factors stated in *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185 (2d Cir. 2008)).

before an immigration judge ("IJ"), and orders that such a hearing be held by Friday, March 27, 2026. The Court, however, denies D.C.'s separate request that this Court order his immediate release.

## I.    Background[2]

### A.    D.C. Arrives in the United States and Builds a Life in New York City

D.C., age 62, is a citizen of the Dominican Republic ("D.R.") who has resided in the United States for most of his adult life. Dkt. 1-1 ("Jessar Decl.") ¶ 4. He unlawfully entered the United States at an unknown time and place. Dkt. 13 ("Irving Decl.") ¶ 3. D.C.'s counsel attests that D.C. migrated to the United States around 1982 (at age 19), Jessar Decl. ¶ 4, although D.C. informed ICE that he entered the United States around 1996 (at age 33), Irving Decl ¶ 3.

D.C. has long lived in New York City. Jessar Decl. ¶ 24. He had three daughters with his then-partner, a United States citizen. *Id.* D.C.'s daughters, also U.S. citizens, are ages 15, 18, and 20. Dkt. 1-2 ("Competency Eval.") at 4; Pet. ¶ 9. The eldest attends Columbia University on a scholarship. Jessar Decl. ¶ 24.

Initially, D.C. worked as a school janitor and construction worker. *Id.*; Competency Eval. at 5. In 2004, he opened a hair salon in Central Harlem, Jessar Decl. ¶ 24, which he owned and operated until his arrest in 2024, Competency Eval. at 4.

### B.    D.C.'s Criminal Convictions and 2024 Incarceration

D.C. has four criminal convictions.

---

[2] This account draws on D.C.'s petition, Dkt. 1; the declaration of his attorney, Alec Jessar, Dkt. 1-1; D.C.'s competency evaluation by Dr. Macarena Corral, Dkt. 1-2; D.C.'s medical evaluation by Dr. Jennifer Sugijanto, Dkt. 1-3; D.C.'s release plan, Dkt. 1-4; D.C.'s immigration documents, Dkt. 11; and the declaration of deportation officer Kerryn Irving, Dkt. 13.

On February 7, 1997, D.C. was charged with one count of possession of a controlled substance in the third degree, in violation of N.Y. Penal Law ("NYPL") § 220.16(1), and three counts of sale of a controlled substance in the third degree, in violation of NYPL § 220.39(1). Irving Decl. ¶ 4. D.C. did not appear for trial. Jessar Decl. ¶ 34. On January 21, 1998, a jury found him guilty on all counts, and a bench warrant issued. Irving Decl. ¶ 4. On March 12, 1998, D.C. was sentenced in absentia to three to nine years' imprisonment. *Id.* As described below, he did not serve this sentence until 2024.

On May 17, 2007, D.C. was charged with possession of a forged instrument in the second and third degrees, in violation of NYPL §§ 170.25, 170.20, Irving Decl. ¶ 5, for presenting false identification to law enforcement, Jessar Decl. ¶ 36. On August 1, 2007, a bench warrant was issued in connection with those charges. Irving Decl. ¶ 5.

On January 12, 2016, after a dispute with his partner, D.C. was charged with strangulation in the second degree, in violation of NYPL § 121.12; assault in the third degree, in violation of NYPL § 120.00; criminal obstruction of breathing and circulation, in violation of NYPL § 121.11(A); and acting in a manner to injure a child under age 17, in violation of NYPL § 260.10. Irving Decl. ¶ 6. On January 14, 2016, D.C. pled guilty to criminal obstruction of breathing and circulation. *Id.* He also pled guilty to the 2007 charge (possession of a forged instrument). *Id.* D.C. was sentenced to a conditional discharge and five-year order of protection, *id.*, and ordered to participate in treatment programming, which he completed, Jessar Decl. ¶ 37.

On October 5, 2016, D.C. was charged with criminal contempt in the second degree, in violation of NYPL § 215.50(3). Irving Decl. ¶ 7. On October 7, 2016, he pled guilty and was sentenced to nine days' imprisonment and a five-year order of protection. *Id.*

On April 15, 2024, D.C. was stopped for a license-related violation, and the police arrested him, based on the bench warrant from 1998. Jessar Decl. ¶ 41; Irving Decl. ¶ 8. On May 7, 2024, the state court judge executed the three-to-nine-year sentence imposed in 1998. Jessar Decl. ¶ 42. On May 31, 2024, D.C. was admitted to the New York State Department of Corrections and Community Supervision Ulser Correctional Facility ("Ulster"), in Napanoch, New York, to serve that sentence. Irving Decl. ¶ 9.

**C.      ICE Initiates Removal Proceedings During D.C.'s Incarceration**

On June 6, 2024, ICE agents conducted a consensual interview of D.C. at Ulster. *Id.* ¶ 10. D.C. told the agents that he was born in the D.R., was a citizen of the D.R., and entered the United States around 1996 using another person's identification. *Id.*

On February 13, 2025, D.C. was issued a notice to appear (Form I-862), charging him with inadmissibility pursuant to 8 U.S.C. § 1182(a)(6)(A)(i) (presence without admission or parole), § 1182(a)(2)(B) (two or more criminal convictions for which aggregate sentences of confinement were five years or more), § 1182(a)(2)(C) (illegal trafficking in a controlled substance), and § 1182(a)(2)(A)(i)(I) (crime involving moral turpitude). Dkt. 11-4 ("NTA") at 4–5. The NTA directed him to appear before an IJ at a specified date and time. *Id.* at 1.

D.C. appeared in immigration court three times while in criminal custody. On April 10, 2025, he appeared *pro se* at a master calendar hearing by video teleconference. Irving Decl. ¶ 13. On June 12, 2025, D.C.'s retained attorney failed to appear at a master calendar hearing, and the matter was adjourned. *Id.* ¶ 14. On August 14, 2025, D.C. and his attorney appeared at a master calendar hearing by video conference. *Id.* ¶ 15. The matter was adjourned, at D.C.'s attorney's request, to enable him to prepare for the pleadings phase of the proceedings. *Id.*

4

On September 8, 2025, D.C. completed serving his sentence and was released. *Id.* ¶ 16.[3]

### D.    ICE Continues Removal Proceedings Upon Completion of D.C.'s Sentence

That same day, D.C. was arrested pursuant to a Form I-200, Dkt. 11-5 ("arrest warrant"), and detained pending resolution of removal proceedings. Irving Decl. ¶ 17. He was transferred to Orange County Jail ("OCJ") in Goshen, New York, where he remains detained today. *Id.*

On September 15, 2025, D.C. appeared with his attorney in immigration court. *Id.* ¶ 18; Jessar Decl. ¶ 28. Counsel requested time to gather information about the allegations in the NTA. Jessar Decl. ¶ 28. The IJ scheduled a merits hearing for later that month. Irving Decl. ¶ 18.

On September 24, 2025, D.C. appeared with his attorney for the merits hearing. *Id.* ¶ 19. Counsel moved to withdraw, citing a breakdown in the attorney-client relationship due to D.C.'s mistrust of him. Jessar Decl. ¶ 28. The IJ scheduled a master calendar hearing for October to enable D.C. to find new counsel, and, on October 6, 2025, again adjourned for this purpose. *Id.*

On October 15, 2025, D.C. appeared *pro se* at a master calendar hearing. Irving Decl. ¶ 20. The IJ took pleadings and sustained the charges of inadmissibility under 8 U.S.C. § 1182(a)(6)(A)(i), (a)(2)(B), and (a)(2)(A)(i)(I), but not under § 1182(a)(2)(C) (illegal trafficking in a controlled substance). Jessar Decl. ¶ 29. The IJ ordered D.C. to file applications for relief by the next court date. *Id.*

On October 29, 2025, D.C. appeared *pro se* at a master calendar hearing and filed two applications for relief from removal: one for asylum and withholding of removal (Form I-589), and another for cancelation of removal and adjustment of status for certain nonpermanent

---

[3] D.C.'s release that day resulted from a decision by the state court, on a motion by D.C., to resentence him to a one-year determinate sentence. Jessar Decl. ¶ 43.

residents (Form EOIR-42B). *Id.* ¶ 30. On November 12, 2025, the IJ adjourned to enable D.C. to gather evidence in support of his applications. *Id.* On December 1, 2025, the IJ scheduled a merits hearing for December 29, 2025 to adjudicate the applications. *Id.* The IJ stated that he would adjourn the hearing if D.C. retained counsel. *Id.* On December 15, 2025, D.C. retained counsel from the Bronx Defenders, who remain D.C.'s counsel. *Id.* ¶ 31.

On December 29, 2025, counsel moved to adjourn the merits hearing and schedule a master calendar hearing to enable counsel to submit amended applications for relief. *Id.* The IJ granted that request and scheduled a master calendar hearing for January. Irving Decl. ¶ 24.

On January 12, 2026, D.C. and counsel appeared at a master calendar hearing and filed amended applications for relief from removal. *Id.* ¶ 25. The IJ scheduled the merits hearing for February. *Id.*

On January 24, 2025, counsel informed the IJ that, due to growing concerns about D.C.'s mental health, counsel had retained a licensed psychologist to evaluate D.C. Jessar Decl. ¶ 32. Depending on the psychologist's findings, counsel stated, he might seek a competency hearing before the merits hearing. *Id.* On February 5, 2026, counsel moved for the merits hearing to be converted to a competency hearing. *Id.* On February 11, 2026, the IJ granted that motion. *Id.* The next day, the IJ found D.C. incompetent, but that his case could proceed with safeguards. *Id.* The IJ scheduled D.C.'s merits hearing for March 24, 2026. Irving Decl. ¶ 26. That hearing has since been adjourned *sine die* by the IJ. Dkt. 21.

### E.    D.C.'s Mental and Physical Health Worsens

D.C. has multiple chronic health conditions. Based on a review of medical records, Dr. Jennifer Sugijanto found that D.C. has type 2 diabetes mellitus, essential (primary) hypertension,

and hyperlipidemia (elevated cholesterol). Dkt. 1-3 ("Medical Eval.") at 2.[4]  These conditions continue to worsen. *Id.* at 3. As of September 11, 2025, the date of D.C.'s intake at OCJ, his blood sugar was approximately 500 mg/DL—a "medically dangerous level" associated with hyperosmolar hyperglycemic state, a "life-threatening condition that causes severe dehydration, altered mental status, seizures, coma, and death." *Id.*  That same day, D.C.'s blood pressure was 190/88 and he was found to have peripheral edema (swelling of his lower extremities). *Id.* These symptoms indicate that D.C. had experienced a hypertensive crisis, which can cause damage to organs and lead to strokes, heart attacks, and kidney damage. *Id.*  Based on her review, Dr. Sugijanto concluded that D.C.'s refusal to accept treatment since his detention has exacerbated his conditions. He has refused to take his prescribed diabetes medications, declined tests to monitor his blood sugar, and refused blood pressure lowering medications and further blood-pressure checks. *Id.* at 3–4. If D.C.'s conditions continue to go untreated, she opined, he will be at "increased risk of death." *Id.* at 3.

D.C.'s refusal to accept medical treatment appears to result from his mental health conditions. Dr. Macarena Corral, a licensed psychologist, met with D.C. twice in January 2026 and tested him for depression, anxiety, mental status, and cognitive concerns. Competency Eval. at 2. She found that D.C. likely has an adjustment disorder, with mixed anxiety and depressed mood; a delusional disorder, persecutory type; and an unspecified neurocognitive disorder. *Id.* at 11–12. As to the delusional disorder, she stated: "His distrust is not rooted in religious delusions, but rather in a firm belief that others, particularly his attorneys and medical staff, are acting against his interests or seeking to harm him." *Id.* at 12. Dr. Corral found that D.C.'s

---

[4] Dr. Sugijanto reviewed D.C.'s medical records but did not interview him or conduct a physical examination. Medical Eval. at 2.

untreated diabetes and hypertension likely exacerbate his cognitive challenges, leading to "a cycle in which worsening cognitive impairment may further his capacity to process information, make informed decisions, and engage in treatment, thereby reinforcing his mistrust and resistance to care." *Id.* As to treatment, Dr. Corral opined that D.C. "would likely have greater difficulty engaging in treatment while in detention" because detention "exacerbates his persecutory beliefs and mistrust of staff, further impeding his willingness to engage in medical and mental health care." *Id.* at 13.

### F.    D.C. Seeks Administrative Relief

On January 24, 2026, alerted to the severity of D.C.'s medical conditions, his counsel emailed a release request to ICE. Jessar Decl. ¶ 21. On February 11, 2026, counsel received a denial letter from ICE stating that there was "no compelling reason to warrant a favorable exercise of discretion in this case." *Id.* ICE's cover email directed counsel to advise D.C. to follow his treatment plan, which counsel did. *Id.*

On February 15, 2026, counsel submitted another release request to ICE and attached the competency and mental health evaluations. *Id.* ICE has not responded to that request. *Id.*

### G.    D.C. Files This Petition

On March 5, 2026, D.C. filed the instant petition for a writ of habeas corpus, a declaration, and supportive exhibits. Dkt. 1. That day, the Honorable Katherine Polk Failla, sitting in Part One, issued an order preserving the Court's jurisdiction pending adjudication of the petition. Dkt. 4.

On March 6, 2026, this Court scheduled a hearing and set a briefing schedule, Dkt. 6, which it later extended at respondents' request, Dkt. 9. On March 13, 2026, respondents

opposed the petition, Dkt. 12 ("Opp'n"), and filed declarations and exhibits, Dkts. 11, 13–15.[5]

On March 14, 2026, D.C. filed his reply, along with an exhibit. Dkt. 17 ("Reply").

On March 16, 2026, the Court directed respondents to confirm that, were the Court to order a bond hearing for D.C. before an IJ, they could guarantee that it would be held by Friday, March 27, 2026. Dkt. 18. That day, respondents filed a letter so confirming. Dkt. 19.

On March 19, 2026, the Court held a hearing on D.C.'s petition.

## II. Applicable Legal Standards

### A. The Attorney General's Authority to Detain Noncitizens Pending Removal

Section 1226 of Title 8 generally governs the process of arresting and detaining noncitizens pending their removal. *Jennings v. Rodriguez*, 583 U.S. 281, 288 (2018). Section 1226(a) sets out a default rule of discretionary detention, providing that the Attorney General may detain a noncitizen "pending a decision on whether the alien is to be removed from the United States," and "may release the alien on . . . bond . . . or conditional parole." *Id.* (citing 8 U.S.C. § 1226(a)(2)).

Salient here, however, § 1226(c) carves out a category of noncitizens who are subject to mandatory detention. *Id.* at 289. It states that the Attorney General "*shall* take into custody," 8 U.S.C. § 1226(c)(1) (emphasis added), any noncitizens "who have committed one of certain listed offenses or who have been identified by the government as involved in terrorist activities."

---

[5] The Government simultaneously filed an unopposed motion to seal D.C.'s medical records and declarations discussing those records. Dkt. 10. The Court grants that motion. *See, e.g.*, *Gutierrez v. Dubois*, No. 20 Civ. 2079, 2020 WL 3072242, at *10 (S.D.N.Y. June 10, 2020) (noting "considerable privacy interest in . . . sensitive medical information" (citation omitted)); *Hand v. N.Y.C. Transit Auth.*, No. 11 Civ. 997, 2012 WL 3704826, at *5 (E.D.N.Y. Aug. 26, 2012) ("Federal law generally treats medical records as confidential." (citing Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub. L. 104–191 (1996)).

*Black v. Decker*, 103 F.4th 133, 140–41 (2d Cir. 2024). For such persons, the statute "allows release in extremely limited circumstances: 'only if the Attorney General decides . . . that release of the alien from custody is necessary for [witness protection purposes].'" *Id.* at 141 (quoting 8 U.S.C. § 1226(c)(4)).

### B.    The District Court's Authority to Grant Relief

Section 2241 of Title 28 "authorizes a district court to grant a writ of habeas corpus whenever a petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States.'" *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003) (quoting 28 U.S.C. § 2241(c)(3)). "This includes claims by non-citizens challenging the constitutionality of their detention without bail." *Cabral v. Decker*, 331 F. Supp. 3d 255, 258 (S.D.N.Y. 2018) (citing *Demore v. Kim*, 538 U.S. 510, 516–17 (2003)).

## III.    Discussion

D.C.'s petition raises three issues: (1) whether his prolonged detention without a bond hearing violates his due process rights; (2) if such a hearing is warranted, what procedural protections due process requires at that hearing; and (3) whether the Court should order D.C.'s immediate release pending adjudication of his habeas petition.

### A.    Whether Due Process Requires a Bond Hearing

It is undisputed that, under § 1226(c), D.C. is subject to mandatory detention. Pet. ¶ 19; Opp'n at 1. D.C. argues, however, that his continued detention without a bond hearing violates due process. Pet. ¶ 101. Respondents counter that D.C.'s removal proceedings have progressed "swiftly" and that ICE has not "unreasonably prolonged" his detention. Opp'n at 9.

As the parties agree, the Second Circuit's decision in *Black v. Decker* supplies the framework for analyzing D.C.'s due process claim. *See* Pet. ¶ 87; Opp'n at 9–10. The Circuit

there considered whether "prolonged detention under [§] 1226(c) will *at some point* violate an individual detainee's due process rights." *Black*, 103 F.4th at 142 (emphasis in original). It noted that the Supreme Court has resolved certain questions governing mandatory detention under § 1226(c), holding that that provision (1) is facially constitutional insofar as it authorizes the Government to detain noncitizens "for the brief period necessary for their removal proceedings," *Demore*, 538 U.S. at 513; and (2) textually authorizes prolonged detention without a bond hearing and cannot be read, as many courts (applying the canon of constitutional avoidance) had held, to implicitly set a six-month time limit on holding a non-citizen without such a hearing, *Jennings*, 583 U.S. at 304. But, the Circuit noted, those decisions did not address whether—and if so, under what circumstances—prolonged detention under § 1226(c) would be unconstitutional. *Black*, 103 F.4th at 142. Nor did they address "what procedures due process may require." *Id.*

In *Black*, the Circuit addressed these constitutional questions. It held that "due process bars the Executive from detaining . . . individuals for an unreasonably prolonged period under [§] 1226(c) without a bond hearing." *Id.* at 143. It declined to adopt a "bright-line constitutional rule requiring a bond hearing after six months of detention—or after any fixed period of detention." *Id.* at 150. Instead, it held, "due process challenges to prolonged detention under [§] 1226(c) should . . . be reviewed" under the balancing test of *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), which is used to determine what procedural due process is required before the government deprives a person of a liberty interest. *Id.* at 147. The *Mathews* test requires courts to balance the following three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and

11

administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335.

Guided by the Circuit's discussion in *Black*, the Court considers these factors in turn.

### 1.    The Private Interest

The first *Mathews* factor considers "the private interest that will be affected by the official action." *Id.* D.C.'s continued detention without a bond hearing implicates "the most significant liberty interest there is—the interest in being free from imprisonment." *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020). "Case after case instructs us that in this country liberty is the norm and detention 'is the carefully limited exception.'" *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)). Accordingly, detention "for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Id.* (quoting *Jones v. United States*, 463 U.S. 354, 361 (1983)).

For several reasons, D.C.'s liberty interest in being free from continued detention is substantial.

First, D.C. has been detained for nearly six and a half months. The Circuit underscored in *Black* that there is no bright-line test for when detention without a bond hearing violates due process. *Black*, 103 F.4th at 150. However, the Circuit read the case law, including *Zadvydas v. Davis*, 533 U.S. 678 (2001) and *Demore*, to "imply . . . that any immigration detention exceeding six months without a bond hearing raises serious due process concerns." *Black*, 103 F.4th at 150.[6] Consistent with that discussion, lower court decisions in this Circuit—before and after

---

[6] *Zadvydas* addressed challenges to 8 U.S.C. § 1231(a), which governs detention after a final order of removal has been entered. 533 U.S. at 682. That provision states that "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days," but that such noncitizens "may be detained beyond the removal period." *Id.* (citing 8 U.S.C. § 1231(a)(1)(A), (a)(6)). Finding that a statute "permitting indefinite detention

*Black*—have underscored the heightened severity of detention exceeding six months, and in cases under § 1226(c), have been more likely to find a due process violation where detention without a bond hearing has extended beyond six months.[7]

To be sure, some adjournments of D.C.'s merits hearing have been at his request, although the most recent was not. (Due to the IJ's scheduling conflict, that hearing was adjourned from March 24, 2026 to an as-yet unscheduled date. Dkt. 21.) But *Black* does not "suggest that whether the detainee sought extensions is relevant to determining whether he or she

---

of an alien would raise a serious constitutional problem," *id.* at 690, the Court held that, under § 1231(a), there is an implicit "presumptively reasonable period of detention" of six months, after which a noncitizen would have the opportunity to seek release, *id.* at 701. In *Demore*, in the course of finding facially constitutional mandatory detention under § 1226(c) during a noncitizen's removal proceedings, the Court distinguished detention under § 1226(c) from that under § 1231(a) because it is "of a much shorter duration," noting that in 85% of cases in which noncitizens are detained under § 1226(c), "removal proceedings are completed in an average time of 47 days and a median of 30 days." *Demore*, 538 U.S at 529. The Circuit read these precedents to imply that detention for more than six months raises heightened due process concerns, much as a noncitizen's "liberty interests [are] more seriously infringed" where his detention under § 1226(c) exceeds the "relatively short duration"—a month and a half— envisioned in *Demore*. *Black*, 103 F.4th at 151 (citing *Demore*, 538 U.S. at 529).

[7] *See, e.g., M.P.L. v. Arteta*, No. 25 Civ. 5307, 2025 WL 2938993, at *3 (S.D.N.Y. Oct. 16, 2025) (finding due process violation based on seven-month detention without bond hearing, which "far exceeds the 'relatively short duration of section 1226(c) detention' envisioned in *Demore*" (citation omitted)); *J.M.P. v. Arteta*, 804 F. Supp. 3d 387, 393 (S.D.N.Y. 2025) (same); *Veletanga v. Noemi*, No. 25 Civ. 9211, 2025 WL 3751865, at *5–7 (S.D.N.Y. Dec. 26, 2025) (same as to three-month detention without bond hearing); *Sajous v. Decker*, No. 18 Civ. 2447, 2018 WL 2357266, at *10 (S.D.N.Y. May 23, 2018) ("[D]etention that has lasted longer than six months is more likely to be 'unreasonable,' and thus contrary to due process, than detention of less than six months." (citation omitted)); *Cabral*, 331 F. Supp. 3d at 261 (seven-month detention without a bond hearing "is within the range that this Court has found sufficient to show a due process violation"); *Araujo-Cortes v. Shanahan*, 35 F. Supp. 3d 533, 535 (S.D.N.Y. 2014) (granting release to noncitizen detained under § 1226(c) who "has been in detention for over six months without any hearing to determine whether his detention is appropriate or necessary"); *see also Lopez v. Sessions*, No. 18 Civ. 4189, 2018 WL 2932726, at *14 (S.D.N.Y. June 12, 2018) ("[C]ourts in this Circuit have generally been skeptical of prolonged detention of removable immigrants, without process, lasting over six months.").

has been subjected to 'prolonged detention.'"[8]  *See J.C.G. v. Genalo*, No. 24 Civ. 8755, 2025 WL 88831, at *10 (S.D.N.Y. Jan. 14, 2025).  On the contrary, a petitioner in *Black* had received "numerous adjournments."  *See Black*, 103 F.4th at 140 (recounting "delays occasioned in part by the need for [petitioner's] newly retained counsel to prepare his application for deferral of removal").  And the adjournments at D.C.'s request were not the product of "dilatory or bad-faith tactics," *J.C.G.*, 2025 WL 88831, at *10, but came about, in sequence, because D.C. was unrepresented, required new counsel because of a breakdown in the relationship with retained counsel, and then required a competency hearing.  Jessar Decl. ¶¶ 27–32.  Such delays do not undermine his request for a bond hearing.  *Diaz v. Genalo*, No. 22 Civ. 3063, 2023 WL 5322180, at *8 (S.D.N.Y. July 6, 2023) (declining to fault petitioner for "non-frivolous litigation choices" such as request for a competency hearing, which "was entirely appropriate, as evidenced by the fact that the government ultimately stipulated that he was in fact incompetent"), *report and recommendation adopted as modified*, No. 22 Civ. 3063, 2024 WL 4124756 (S.D.N.Y. Sept. 9, 2024).

Second, credible evidence supports that D.C.'s detention exacerbates his severe physical and mental health conditions.  As to the former, his September 2025 medical records reflect that his type 2 diabetes mellitus and essential (primary) hypertension have worsened and may become life-threatening if untreated.  Medical Eval. at 3 (conditions have "worsened" and will "place[] him at increased risk of death" if untreated); *id.* at 5 ("he is at high risk of serious harm and morbidity from uncontrolled diabetes and high blood pressure").  As to the latter, D.C.'s

---

[8] Before *Black*, district courts assessing the constitutionality of prolonged detention under § 1226(c) considered, among several other factors, "whether the alien is responsible for the delay." *Sajous*, 2018 WL 2357266, at *10.

persecutory delusional disorder, adjustment disorder, and unspecified neurocognitive disorder have also worsened during his detention. *See* Competency Eval. at 11, 13 (detention "amplifies [D.C.'s] mistrust of staff and reinforces his persecutory beliefs" and has led to "severe sleep disturbances, chronic fatigue, and a notable 50-pound weight loss").[9]  D.C.'s refusal of treatment while incarcerated, traceable to his mental disorders, heightens the risks detention presents for him. *See* Medical Eval. at 4 (D.C.'s thoughts that medical professionals "are out to harm him" are "undoubtedly driving his refusal of medical treatment").[10]

Third, as a result of D.C.'s detention, he has been separated from his three daughters, the youngest of whom is 15 years old. Competency Eval. at 4. That has taken a toll on him and his family. According to one daughter, before the detention, "she and her father were closer than they had ever been before," "were spending a lot of time together," and "[D.C.] taught her how to drive before college." Dkt. 1-4 ("Release Plan") at 2. D.C. has "expressed significant worry about how his incarceration is affecting his daughters, with particular concern for his

---

[9] Respondents have stated, based on the declaration of licensed clinical psychologist Emily Streeter, that D.C. "carries no mental health diagnosis." Opp'n at 4 (citing Dkt. 15 ("Streeter Decl.") ¶ 9). But Streeter's declaration, while stating that D.C. had been "seen by a mental health provider on February 20, 2026," notably did not state that any mental health test had been administered. Streeter Decl. ¶ 9. In contrast, Dr. Corral's assessment was based on "a comprehensive clinical interview and mental health screening." Competency Eval. at 2. The Government's characterization is also undermined by the determination of the IJ, drawing on Dr. Coral's assessment, that D.C. is incompetent. Jessar Decl. ¶ 32.

[10] In her evaluation of D.C., Dr. Sugijanto noted that there are "significant gaps in medical care" at OCJ, and that OCJ has documented D.C.'s repeated refusals of care without evident "periodic reassessment/follow up, alternative strategies, or escalation to ensure that [D.C.] fully understands the severity and immediacy" of his conditions. Medical Eval. at 4–5. Other cases have described similar shortcomings. *See, e.g., J.M.P. v. Arteta*, 807 F. Supp. 3d 265, 290 (S.D.N.Y. 2025) ("[OCJ] has been the subject of complaints for its treatment of ICE detainees, including allegations of medical neglect, lack of access to unspoiled food, and abuse, harassment, and retaliation by jail personnel."); *O.F.C. v. Almodovar*, No. 25 Civ. 9816, 2026 WL 74262, at *9 (S.D.N.Y. Jan. 9, 2026) (same).

15

youngest . . . whom he believes is suffering the most because of his absence." Competency Eval. at 4.[11]

Respondents make two counterarguments. First, they note that a noncitizen who is detained pursuant to § 1226(c) does not have a right to be free from detention during removal proceedings. Opp'n at 10. That observation does not advance the analysis. Noncitizens are entitled to due process during their removal proceedings, regardless of whether their detention pending those proceedings is discretionary or mandatory. *See Demore*, 538 U.S. at 523. Under *Black*, after a point determined by the *Mathews* factors, D.C. is entitled to a hearing to determine whether his continued pre-removal detention is warranted. *Black*, 103 F.4th at 150–51.

Second, respondents blame D.C. for his worsening medical and mental health conditions, noting his refusal of treatment while in custody. Opp'n at 10, 15 (citing Dkt. 14 ("Moody Decl.")); *see* Moody Decl. ¶ 11 (since September 8, 2025, D.C. "has refused to be seen by medical staff for vital sign checks and blood glucose checks" and "has had well over 100 refusals documented for medical care"). D.C.'s refusal of treatment is well chronicled. But respondents unhelpfully elide the important fact that that refusal appears traceable to his serious mental health disorders. As his competency evaluation substantiated, D.C.'s unwillingness to accept medication or participate in check-ups appears to stem from his delusion of persecutions, which are exacerbated by continued detention. *See* Competency Eval. at 12.

Based on the duration of D.C.'s detention and the toll it takes for reasons particular to him, the Court finds that the first *Mathews* factor—the private interest affected by the

---

[11] Although more germane to the consequences of potential deportation, that D.C. has lived in the United States for much of his adult life also bears on the consequences to him of detention. *See Veletanga*, 2025 WL 3751865, at *6 (first *Mathews* factor "weighs heavily" in favor of petitioner who had lived in the country for "more than two decades" (quoting *Perez Flores v. Bondi*, No. 25 Civ. 306, 2025 WL 1921748, at *6 (W.D.N.Y. July 14, 2025)).

16

Government's action—heavily favors a bond hearing to assess the continued need for detention. *See, e.g.*, *O.F.C. v. Almodovar*, No. 25 Civ. 9816, 2026 WL 74262, at *9 (S.D.N.Y. Jan. 9, 2026) (conditions of confinement "further heightens [petitioner's] liberty interest" where, "[a]s during his previous incarceration at OCJ, [p]etitioner's psychological and physical health has deteriorated" (citation omitted)); *Black*, 103 F.4th at 151 (liberty interest "seriously affected" based on financial consequences for petitioner's family, which included "three young children"); *M.P.L. v. Arteta*, No. 25 Civ. 5307, 2025 WL 2938993, at *3 (S.D.N.Y. Oct. 16, 2025) (similar).

### 2.    The Risk of Erroneous Deprivation

The second *Mathews* factor concerns "the risk of an erroneous deprivation" of D.C.'s liberty, and "the probable value, if any, of additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 335.  The risk the Court considers is whether the noncitizen's "prolonged detention" may be "unjustified," *i.e.*, whether continued detention may be unnecessary to protect the community or guard against flight. *See Black*, 103 F.4th at 153.  "The only interest to be considered at this part of the *Mathews* analysis is that of the detained individual[]—not the government." *Id.* at 152.

In *Black*, the Second Circuit noted that § 1226(c) affords few procedures for the detainee, in that it lacks a "mechanism for a detainee's release" and "for individualized review of the need for protection." *Id.*  The sole procedural protection it embeds is a *Joseph* hearing, at which the noncitizen can contest whether he committed the crime that makes him subject to mandatory detention. *Id.* (citing *Matter of Joseph*, 22 I. & N. Dec. 799 (BIA 1999)).  As a result, the Circuit stated, "many noncitizens are detained 'who, for a variety of individualized reasons, are not dangerous, have strong family and community ties, [and] are not flight risks.'" *Id.* (citation omitted).  The Circuit thus found prolonged detention under § 1226(c) inherently to entail a high

risk of erroneous deprivation of liberty. And, it stated, "almost *any* additional procedural safeguards at some point in the detention would add value." *Id.* at 153 (emphasis in original).

This case is no exception to that norm. At no point has there been any assessment by a neutral of whether D.C.'s detention is necessitated by the interests in public safety or avoiding flight. This Court cannot prejudge those inquiries, which would turn on the evidence adduced by ICE and D.C. It suffices to note that D.C. has previewed responsible arguments in favor of his release on bond. These include that D.C. is age 62, frail, weak, and infirm; that his criminal record does not reflect any offense for nearly a decade; and that for approximately 20 years he maintained stable employment as the owner and operator of a hair salon. Jessar Decl. ¶¶ 22, 24, 33. In addition, D.C. has three daughters and claims to have the support of a community of "residents and other business owners" to which he would return upon release, which include his longtime friend and business partner. Release Plan at 2. A bond hearing would permit D.C. to pursue these arguments for release. The absence of such a hearing gives rise to a risk that his continued detention is unnecessary.

In their opposition brief, respondents do not argue that D.C. poses a risk of flight or danger to the public, although they have not abandoned such arguments. Instead, they argue that D.C. will shortly receive adequate process, in that he has a pending application for relief from removal, which, as of respondents' brief, was scheduled for March 24, 2026. Opp'n at 1, 11. Respondents' argument, however, was thereupon undercut by the adjournment, *sine die*, of that hearing. Regardless, a merits hearing is "separate and apart from" a bond determination. *Amides-Galdamez v. Barr*, 810 F. App'x 52, 53 (2d Cir. 2020) (summary order) (quoting 8 C.F.R. § 1003.19(d)). The former considers whether the noncitizen is removable from the U.S. or has valid claims for relief from removal, while the latter considers whether the noncitizen's

detention pending such removal is justified. Because a merits hearing does not provide a mechanism "for individualized review of the need for detention," *Black*, 103 F.4th at 152, it is an inadequate safeguard against unnecessary detention. As a result, courts commonly order bond hearings notwithstanding that the noncitizen has a pending application for relief from removal. *See, e.g.*, *Veletanga v. Noemi*, No. 25 Civ. 9211, 2025 WL 3751865, at *1 (S.D.N.Y. Dec. 26, 2025) (ordering bond hearing for noncitizen with applications for cancelation of removal and asylum); *J.I.T. v. Francis*, No. 25 Civ. 6749, 2025 WL 3295851, at *2 (S.D.N.Y. Nov. 26, 2025) (same for noncitizen whose appeal of merits determination "remains pending"); *J.M.P. v. Arteta*, 807 F. Supp. 3d 265, 275 (S.D.N.Y. 2025) ("*J.M.P. II*") (same).

In light of "the almost nonexistent procedural protections" available to D.C., *Black*, 103 F.4th at 152, and the potential for an individualized assessment of the need for further detention to result in D.C.'s release, this second *Mathews* factor also favors a bond hearing. *See, e.g.*, *Veletanga*, 2025 WL 3751865, at *6 (finding high risk of erroneous deprivation where petitioner "has had no opportunity . . . to argue that he poses no danger to the community and no risk of flight"); *J.M.P. v. Arteta*, 804 F. Supp. 3d 387, 394 (S.D.N.Y. 2025) ("*J.M.P. I*") (same where record reflected petitioner "had lived law-abiding li[fe]" since criminal activity); *M.P.L.*, 2025 WL 2938993, at *3 (finding "a bond hearing would add value by permitting review of [p]etitioner's custody status for the first time in over seven months").

### 3.    The Government's Interest

The third *Mathews* factor considers the Government's interest, including "the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

Respondents argue that because a hearing could result in D.C.'s release, detaining him without a hearing would assure that he (1) will appear at future proceedings and (2) cannot commit crimes endangering the public. The Government, however, made the same argument in *Black*. *See Black*, 103 F.4th at 153. And the Circuit there, while recognizing that assuring the noncitizen's appearance and public safety are "legitimate" and "well-established" interests, held that holding a bond hearing "do[es] nothing to undercut those interests." *Id.* The Government, it stated, "ha[d] not articulated an interest in the prolonged detention of noncitizens who are neither dangerous nor a risk of flight." *Id.* at 154 (quoting *Velasco Lopez*, 978 F.3d at 854). The same is so here. The Court therefore puts these interests aside.

Respondents do not address the fiscal and administrative burdens of a bond hearing. In *Black*, the Government argued requiring a hearing would "strain the immigration adjudication system yet provide little value." *Id.* The Circuit acknowledged that "having to do something instead of nothing imposes an administrative and fiscal burden of some kind," but found that this burden "will likely be outweighed by costs saved by reducing unnecessary detention." *Id.* at 154–55. Consistent with *Black*, the Court finds that, as in any such case, a bond hearing stands to cost the Government time and resources, but that these costs merit limited weight in the *Mathews* analysis.

In consequence, the Court finds that the Government's interests, while legitimate, are not strong. *See, e.g.*, *Veletanga*, 2025 WL 3751865, at *7 (finding respondents have not "identified any particularized or heightened interest that would justify continued detention without such a hearing"); *J.M.P. I*, 804 F. Supp. 3d at 394–95 (similar); *M.P.L.*, 2025 WL 2938993, at *5 (similar). This factor does not materially favor respondents.

20

4.    **Overall Assessment**

This Court, guided by *Black*, finds that these factors viewed in combination support affording D.C. a bond hearing.  The first two factors (D.C.'s substantial liberty interests and the risk of error inherent in depriving him a bond hearing) outweigh the third (the modest administrative cost a hearing imposes on the Government).  In *Black*, the Circuit recognized that the Government's legitimate administrative interests may justify a "relatively short-term deprivation of liberty," but that "the balance of interests shifts as the noncitizen's detention is prolonged without any particularized assessment of need." *Black*, 103 F.4th at 154.  Such is the case here.  D.C. has been detained for nearly six and a half months under circumstances that make each day in custody extra onerous and hazardous due, in particular, to his serious medical and mental health deterioration.  With his merits hearing having been deferred indefinitely, and with an appeals process likely to follow in the event of an adverse determination at that hearing, there is no end in sight to D.C.'s detention, whether via release on bail or removal from the country. *See* Reply at 5–6 (noting that "administrative appeal process can last several months," after which "D.C. can petition for review of the resulting decision to the Second Circuit").  D.C. therefore has a substantial liberty interest in a hearing to test the need for continued detention.  That interest outweighs the Government's legitimate, but finite, interest in avoiding the administrative burdens of such a hearing.

The Court accordingly finds D.C.'s detention has been sufficiently prolonged to require a bond hearing as a matter of procedural due process.  *See, e.g., Black*, 103 F.4th at 155 (ordering bond hearing where noncitizen had been detained under § 1226(c) for seven months without such a hearing); *M.P.L.*, 2025 WL 2938993, at *5 (same); *J.M.P. I*, 804 F. Supp. at 395 (same);

*Veletanga*, 2025 WL 3751865, at *7 (same where noncitizen had been detained for three months).[12]

**B.     What Procedural Protections Are Due**

The Court briefly considers issues raised by the parties as to the nature of the upcoming bond hearing.

**1.     Proper Court to Hold the Bond Hearing**

D.C. argues that this Court, not an IJ, should conduct D.C.'s bond hearing. Pet. ¶¶ 97–99. D.C. has identified one case in this Circuit in which the district court, after granting a petition for a bond hearing, presided over the hearing itself. *L.G.M. v. LaRocco*, 788 F. Supp. 3d 401, 405–06 (E.D.N.Y. 2025). Assuming *arguendo* that that case was properly decided, it is readily distinguished, as the court there noted "atypical" circumstances, including the noncitizen's "complicated" detention history, meriting heightened scrutiny. *Id.* at 405–06. D.C. does not cite similar circumstances here, or any reason to doubt that he would receive a fair bond hearing before an IJ. *See M.P.L.*, 2025 WL 2938993, at *5 (denying request that district court handle bond hearing). Accordingly, there is no basis to depart from the common practice of ordering a bond hearing before an IJ, whose expertise and experience in this area will enable efficient resolution of the proceedings consistent with immigration court precedents. *See, e.g.,*

---

[12] At the March 19, 2026 hearing, D.C. requested, for the first time, that the Court enjoin the Government from seeking an automatic stay, pursuant to 8 C.F.R. § 1003.19(i)(2), of the IJ's bond decision in the event the IJ grants D.C.'s release. The Court notes that dozens of courts across the country have found that automatic stays, which allow DHS to unilaterally override an IJ's decision, violate due process, and thus enjoined the Government from invoking those procedures. *J.M.P. II*, 807 F. Supp. 3d at 288 (collecting cases); *O.F.C.*, 2026 WL 74262, at *15. But because this issue was not briefed by the parties, the Court denies without prejudice D.C.'s request to enjoin the Government from seeking such a stay. In the event that D.C. prevails at his bond hearing and the Government invokes the automatic stay provision, this Court, which has retained jurisdiction over the case, will entertain a request by D.C. for further relief.

*J.C.G.*, 2025 WL 88831, at \*11 (ordering IJ to hold bond hearing); *G.F.F. v. Francis*, No. 25 Civ. 7368, 2025 WL 3141735, at \*7 (S.D.N.Y. Nov. 10, 2025) (same); *J.M.P. I*, 804 F. Supp. 3d at 395 (same); *M.P.L.*, 2025 WL 2938993, at \*7 (same).

### 2.    Procedural Protections at the Bond Hearing

D.C. seeks an individualized hearing at which ICE will have the burden to establish, by clear and convincing evidence, that his continued detention is justified. Pet. at 35. Respondents acknowledge that, under *Black*, ICE will have that burden. Opp'n at 12–13. D.C. further argues that the IJ should be ordered to consider alternatives to detention in assessing both danger to the community and flight risk, and to consider D.C.'s ability to pay, if setting a bond. Pet. at 35. Respondents acknowledge that *Black* supports an IJ's consideration of alternatives to detention with respect to flight risk and of the noncitizen's ability to pay with respect to the size of the bond. Opp'n at 13. But, respondents argue, there is "no basis" for an IJ to consider alternatives to detention with respect to danger. *Id.*

On this question, the Court holds with D.C.—and with the heavy weight of recent case law. *See, e.g., Beltran Marroquin v. Genalo*, No. 24 Civ. 6376, 2025 WL 3241161, at \*3–4 (S.D.N.Y. Nov. 20, 2025) (finding "due process requires an immigration judge to consider alternatives to detention when evaluating whether Petitioner poses a danger to the community"); *M.P.L.*, 2025 WL 2938993, at \*6 (collecting cases holding same); *J.I.T.*, 2025 WL 3295851, at \*5–6; *L.G.M. v. LaRocco*, No. 25 Civ. 2631, 2025 WL 2173577, at \*3 (E.D.N.Y. July 31, 2025); *see also O.F.C. v. Decker*, No. 22 Civ. 2255, 2022 WL 4448728, at \*10 (S.D.N.Y. Sept. 12, 2022) (pre-*Black* decision requiring IJ to "consider alternative conditions of release in deciding the danger question"); *Hernandez-Aviles v. Decker*, No. 20 Civ. 7636, 2020 WL 5836519, at \*2–3 (S.D.N.Y. Oct. 1, 2020) (same). As these decisions recognize, the inquiry

whether a detainee would present a danger if released is necessarily individualized. Among other considerations, detainees' criminal records may vary widely, as may their present-day physical conditions and capacities. For some, restrictions on liberty short of detention may suffice to protect the public. As one court has illustrated the point, "a noncitizen with a history of drunk driving might well pose a serious danger to the community," but such danger "would be ameliorated if the noncitizen were released on the condition that he or she not drive a car." *Cantor v. Freden*, 761 F. Supp. 3d 630, 637–38 (W.D.N.Y. 2025) (citation omitted). The IJ's consideration of alternatives to detention would guard against the risk of D.C.'s continued detention where less restrictive means are available to protect the public.

This consideration is supported by the analogous context of bail determinations in criminal cases. Federal courts, in assessing danger to the community under 18 U.S.C. § 3142, commonly consider alternatives to detention, including whether conditions such as house arrest, home detention, or electronic monitoring would suffice. *See, e.g.*, *United States v. Orena*, 986 F.2d 628, 632 (2d Cir. 1993) (considering whether conditions such as "house arrest, electronic surveillance, and interactions limited to immediate family . . . alleviate appellee's danger to the community"); *United States v. Paulino*, 335 F. Supp. 3d 600, 612 (S.D.N.Y. 2018) (finding conditions including home incarceration with GPS monitoring "more than adequate to mitigate any concerns regarding dangerousness"). There is no sound reason to excise that sensible consideration in the context of immigration detention. *See, e.g.*, *Beltran Marroquin*, 2025 WL 3241161, at *4 ("Courts in this district have viewed [§ 3142] as instructive in determining due process requirements in the context of immigration proceedings."); *Fernandez Aguirre v. Barr*, No. 19 Civ. 7048, 2019 WL 4511933, at *5 (S.D.N.Y. Sept. 18, 2019) (court's requirement that IJ "consider alternatives to detention *before* concluding that detention was appropriate . . .

24

was intended to track the framework for pretrial detention in the criminal context" (emphasis in original)).

Respondents' counterargument—that *Black* forecloses an IJ's consideration of alternatives to detention in assessing dangerousness—misreads that decision. In *Black*, the Circuit reviewed a district court order that, in pertinent part, required the IJ to "consider [p]etitioner's ability to pay and the availability of alternative means of *assuring his appearance*." *See Black v. Decker*, No. 20 Civ. 3055, 2020 WL 4260994, at *9 (S.D.N.Y. July 23, 2020) (emphasis added), *aff'd*, 103 F.4th 133 (2d Cir. 2024). That portion of the order did not concern the IJ's assessment of danger to the community and the Circuit's review of it likewise focused solely on the IJ's assessment of the risk of flight. *See Black*, 104 F.4th at 158. Respondents note that the Circuit, in its discussion, stated that "a showing of dangerousness by clear and convincing evidence would foreclose any possibility of bond," at which point the IJ would have "no reason to consider financial circumstances or alternatives to detention." Opp'n at 13 (quoting *id.* at 159). But that excerpt conveyed merely that, were a noncitizen's dangerousness to require detention, the IJ would have no occasion to consider risk of flight or the associated issues of the noncitizen's financial circumstances or alternatives to detention. Taken in context, it cannot fairly be read to bar an IJ from considering alternatives to detention in assessing whether a noncitizen would present a danger to the community if released. *See Beltran Marroquin*, 2025 WL 3241161, at *4 ("[U]nder *Black*'s own conceptual framework . . . there is no logical reason why the Government's burden on dangerousness should be treated differently than risk of flight, at least when it comes to alternatives to detention.").

Accordingly, the Court grants D.C. a bond hearing at which: (1) the Government will have the burden of proof to establish by clear and convincing evidence that D.C. poses a flight

risk or danger to the public; (2) the IJ must consider alternatives to detention in assessing D.C.'s flight risk and future dangerousness; and (3) the IJ, in setting the amount of a bond, must consider D.C.'s ability to pay.

### C.    Whether Immediate Release is Warranted Pending Adjudication of This Petition

D.C. separately asks the Court to order his immediate release pending adjudication of this habeas petition. Pet. ¶ 118.  Respondents oppose.  Opp'n at 14–16.

The Court denies that request.  Federal courts have inherent authority to grant bail to habeas petitioners detained by immigration authorities. *Mapp v. Reno*, 241 F.3d 221, 223 (2d Cir. 2001).  But "[t]he standard for bail pending habeas litigation is a difficult one to meet." *Grune v. Coughlin*, 913 F.2d 41, 44 (2d Cir. 1990).  A court "must inquire into whether the habeas petition raises substantial claims and whether extraordinary circumstances exist that make the grant of bail necessary to make the habeas remedy effective." *Mapp*, 241 F.3d at 230 (cleaned up).  The power to release a habeas petitioner on bail "is a limited one, to be exercised in special cases only." *Id.* at 226.

At the outset, D.C.'s request appears moot.  D.C. seeks release pending adjudication of this petition. Pet. at 35.  This decision, however, has granted D.C. the habeas relief he seeks—a bond hearing.  There is nothing more to adjudicate.

In any event, even if D.C.'s request were construed to seek immediate release irrespective of the status of adjudication of his petition, the extraordinary remedy of immediate release is not warranted.  A bond hearing with constitutionally adequate procedural safeguards, presided over by an IJ, will occur imminently—one week from today.  As the case law reflects, nothing more is needed to make the habeas remedy effective. *See, e.g., Fernandez Aguirre v. Barr*, No. 19 Civ. 7048, 2019 WL 3889800, at *4 (S.D.N.Y. Aug. 19, 2019) ("Because the petition seeks only

a constitutionally-adequate bond hearing, and because the Court has granted that relief, immediate release is not necessary to make the habeas writ effective."); *G.F.F.*, 2025 WL 3141735, at *7 (same); *Reid v. Decker*, No. 19 Civ. 8393, 2020 WL 996604, at *13 (S.D.N.Y. Mar. 2, 2020) (same).

Only in rare cases have courts simultaneously granted immediate release and a request for a bond hearing.[13]  Those largely arose during the early COVID-19 pandemic, in which every additional day in detention posed a mortal risk for immuno-compromised noncitizens.  *See, e.g.*, *Coronel v. Decker*, 449 F. Supp. 3d 274, 289–90 (S.D.N.Y. 2020) ("[t]ypically, courts do not find extraordinary circumstances for habeas petitioners where a constitutionally adequate bail hearing is the relief sought," but "these are not normal circumstances" due to COVID-19 pandemic); *Jovel v. Decker*, No. 20 Civ. 308, 2020 WL 1502038, at *5 (S.D.N.Y. Mar. 24, 2020) (finding extraordinary circumstances supporting release based on petitioner's "unique risk" of serious illness were he to contract COVID-19), *report and recommendation adopted*, No. 20 Civ. 308, 2020 WL 1539282 (S.D.N.Y. Mar. 31, 2020).  D.C.'s ailments, although significant, are not comparable; he has not shown that his condition is so dire that one week in detention while he awaits his bond hearing would so endanger him as to make the bond hearing remedy moot.  *See G.F.F.*, 2025 WL 3141735, at *7 ("It is unclear . . . how continued detention would deprive [petitioner] of his ability to participate meaningfully in the renewed bond hearing, particularly because that hearing is scheduled for no later than seven days from the date on which

---

[13] The two cases D.C. cited at the hearing are inapposite, as each reserved decision on the habeas petition. *See, e.g.*, *Salgado v. Francis*, No. 25 Civ. 6524, 2025 WL 2806757, at *8 (S.D.N.Y. Oct. 1, 2025) (granting *Mapp* release and "reserv[ing] decision on the Amended Petition's habeas claims"); *Barco Mercado v. Francis*, No. 25 Civ. 6582, 2025 WL 3295903, at *3 (S.D.N.Y. Nov. 26, 2025) (bench opinion "conditionally released [noncitizen] pending the determination of this habeas corpus petition promptly thereafter").

this order is issued"); *cf. Coronel*, F. Supp. 3d at 290 (petitioners' claims would "effectively be moot" if they were to contract COVID-19). Accordingly, the Court denies D.C.'s request for immediate release.

## CONCLUSION

For the foregoing reasons, D.C.'s petition for a writ of habeas corpus is granted in part. The Court grants D.C.'s request for a bond hearing but denies his request for immediate release.

By **Friday, March 27, 2026**, respondents shall provide a bond hearing to D.C. Consistent with this decision, at such hearing: (1) the Government will have the burden of proof to establish by clear and convincing evidence that D.C. poses a flight risk or danger to the public; (2) the IJ must consider alternatives to detention in assessing D.C.'s flight risk and future dangerousness; and (3) the IJ, in setting the amount of a bond, must consider D.C.'s ability to pay.

Respondents are ordered to: (1) file a letter on the docket by **March 24, 2026 at 5 p.m.**, confirming that the bond hearing has been scheduled and stating the date and time when it will occur; (2) furnish this decision to the IJ meaningfully in advance of the hearing; and (3) file a letter on the docket by **March 30, 2026 at 5 p.m.**, with an update as to the outcome of the bond hearing.

Should respondents fail to provide such a hearing, respondents shall release D.C. from detention. The Court retains jurisdiction over this matter to ensure compliance with this decision.

The Clerk of Court is respectfully directed to terminate the motions pending at dockets 3 and 10.

28

29

SO ORDERED.

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: March 20, 2026
       New York, New York